## IIN THE UNITED STATES DISTRICT COURT
## FOR RHODE ISLAND

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A CRIMINAL COMPLAINT AND SEARCH WARRANT

I, Caolan Ruadhan Scott, being first duly sworn, hereby depose and state as follows:

### *Introduction and Agent Background*

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I am currently assigned to the FBI's Rhode Island Safe Streets Gang Task Force (hereinafter, the "Task Force") and investigate violent street gangs and drug/firearms trafficking organizations operating in and around the State of Rhode Island. As such, I am a law enforcement officer of the United States within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.      I have received training in the field of narcotics and firearms enforcement and investigations.  I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs and firearms.  I have been the affiant on numerous affidavits in support of search warrants, arrest warrants, wiretaps, and other applications.  Through my training, education, and experience, I have become familiar with the manner in which illegal narcotics and firearms are transported, stored, and distributed, and with the methods of payment for such items.

3.      Additionally, based on my training and experience and my participation in other controlled substance investigations, I know that it is common for drug dealers to "front" (provide on consignment) controlled substances to their customers; to conceal contraband and the

1

proceeds of drug sales, as well as store drugs/firearms and cash in remote locations (sometimes referred to as "stash houses"); to maintain records of drug and gun transactions; and to use cellular telephones to facilitate their illegal distribution operations.  I also know that drug/weapons trafficking is an illicit business and an ongoing process requiring the development, use, and protection of a communication network to facilitate daily drug distribution.  Drug dealers use various methods to thwart law enforcement detection, including frequently changing cellular phones and vehicles, using various aliases, and using coded communications.  Based on my experience in drug and firearm investigations, I know that traffickers frequently refer to illicit drugs and guns in guarded conversations and frequently use code words when referring to controlled substances or money.

### *The Execution of Search Warrants and the Conduct of Drug Traffickers*

4.      Based upon my training and experience, I know that traffickers often place assets, including apartments, houses, vehicles, and telephones, in names other than their own to avoid detection of these assets by government agencies.  Although these assets are held in other names, the drug dealers actually own or use these assets and exercise dominion and control over them.  Records relating to these assets are frequently found in traffickers' residences and other locations controlled by them.

5.      Persons involved in drug and gun trafficking typically conceal in their vehicles, residences, and businesses controlled substances, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value, and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending money made from engaging in narcotic trafficking activities.  Money, tangible

property, and records relating to these assets are frequently found in traffickers' residences and other locations controlled by them.

6.      Drug traffickers often carry, on their person or maintained in secure locations, weapons to protect themselves and their controlled substances from theft by other users, traffickers, or criminals, and from seizure by law enforcement agencies.  Drug traffickers store these weapons in their residences, vehicles, and/or businesses and stash houses, or other locations controlled by them.

7.      Drug traffickers commonly maintain addresses or telephone numbers in books, papers, computers, and cellular telephones that reflect names, addresses, and/or telephone numbers for their associates in the drug trafficking organization, even if that information may be in code.  These types of records are sometimes maintained in computers, cellular telephones or other electronic data storage devices.  Records and electronic devices of this sort are also frequently found on the persons of drug traffickers or in their residences, motor vehicles, and other locations controlled by them.

8.      Drug traffickers frequently take, or cause to be taken, photographs and/or videos of themselves, their associates, or their property.  Records in the form of photographs and/or videos are often found in the residences, offices, or other places under the control of traffickers, and provide valuable evidence of conspiratorial relationships.  Records of this type are sometimes in hard copy are but increasingly found stored on computers, cellular telephones, thumb drives, and other items possessing the capability of storing electronic data.

9.      Drug traffickers often keep equipment and materials for packaging, cutting, weighing, manufacturing, and distributing controlled substances in their homes, stash houses, or other locations controlled by them.  That drug paraphernalia often includes, but is not limited to,

3

scales, plastic wrap, plastic bags, surgical gloves, presses, and cutting agents as well as aromatic substances such as soap, dryer sheets, wood shavings, and heat sealers — all of which are used to mask the odor of illegal drugs in an attempt to avoid detection by drug detection dogs. Large-scale drug traffickers sometimes use money-counting machines to help count and sort the proceeds of drug trafficking.

10.     Drug and gun traffickers commonly consign controlled substances and weapons to their clients and couriers. They frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. Records of this type are kept in locations where traffickers have ready access to them, including on their person or in their residences, vehicles, businesses, smart telephones, tablets and personal computers. Drug and gun traffickers also normally maintain these items and records for long periods of time regardless of whether their value to the dealer has diminished. Oftentimes, this type of evidence is generated, maintained, and then forgotten about. Thus, documents that one would think a prudent person would destroy because of their incriminatory nature are still possessed months or even years after the documents came into the possession of the drug dealer. Oftentimes, these individuals do not even realize the incriminatory nature of the documents they keep. Documentary evidence dating back years is sometimes found in residences and other locations controlled by traffickers.

11.     Persons who reside in or who are using a particular residence will often have documents, bills, and correspondence which list their names and addresses in that residence. Documents such as personal telephone books, address books, utility company receipts, keys, personal letters, rent receipts, mortgage documents, clothing and other articles of personal property would tend to establish residency at a particular location and provide valuable evidence

4

concerning ownership and control over areas in which drugs or other incriminating evidence are found.  Records and documents of this type may also be found in hard copy or stored electronically on computers, mobile telephones, and other media that store data electronically.

### *Purpose*

12.     This affidavit is made in support of an Application for a Criminal Complaint, charging ANTHONY NELSON, also known as "POW", year of birth: 1980 with the following violation of law: 21 U.S.C. § 841(a)(1)(B) – Distribution of five grams or more of crystal methamphetamine; and 21 U.S.C. § 841(a)(1)(C) Distribution of cocaine. This affidavit is also made in support of search warrants for the following property, its common areas, and appurtenances for evidence and proceeds of drug trafficking in violation of 21 U.S.C. § 841(a)(1):

> **ANTHONY NELSON's** residence, located at 36 White Street, apartment 1, Pawtucket, RI, and further described in Attachment A-1 ("the TARGET PREMISES").

> **ANTHONY NELSON's** vehicle, a black 2010 BWM 535i sedan, bearing Rhode Island registration 1FZ181, Vehicle Identification Number: WBANV9C53AC390804 and further described in Attachment A-2 ("the TARGET VEHICLE").

### *Background, Sources, Methods and Means*

13.     This affidavit is based on my own investigation, and on information reliably provided to me by Departments represented on the Task Force, as well as by other federal, state, and local law enforcement officers in Rhode Island. I have relied on information supplied by Agents, Troopers, Detectives and Officers from the FBI, Rhode Island State Police, Providence Police Department, Cranston Police Department, Pawtucket Police Department, Woonsocket Police Department, Central Falls Police Department, and the Rhode Island Department of

Corrections. I have also relied on reports of investigations that I have prepared or that were prepared by other law enforcement agents; business records, and public and/ or law enforcement databases. I have also relied on information provided to me by a cooperating witness who I will refer to only as CW-l[1].

## PROBABLE CAUSE

14.    In February of 2022, the FBI's Rhode Island Safe Streets Gang Task Force ("TASK FORCE") commenced an investigation targeting a source of supply for crystal methamphetamine and cocaine in the State of Rhode Island. To date, agents CW-1 to make three "controlled buys" of narcotics from ANTHONY NELSON. Agents were alerted to NELSON's narcotics trafficking by CW-1 in February 2022. NELSON provided CW-1 with telephone number (603) 349-3141 (the 3141 number)[2]. NELSON stated he was able to sell CW-1 either powder cocaine and/or crystal methamphetamine.

15.    When a controlled buy was made, law enforcement investigators checked CW-1 for contraband prior to the transaction to be sure that CW-1 was not already in possession of any narcotics, firearms, or cash. CW-1 never was. CW-1 was supplied with only enough Official Government Currency ("OGC") for the purchase of the amount of drugs that had been ordered. CW-1 was followed to the transaction site by surveillance officers and surveillance was maintained near the drug deal. Following the transaction, CW-1 was followed to a predetermined

---

[1] CW-1 has been providing the government with information since February of 2022. CW-1 is motivated by financial means for his/her cooperation in this investigation. CW-1 has a criminal history that includes felony convictions for drug distribution and second degree sexual assault. Since the start of his/her cooperation, CW-1 has provided the FBI with information that I or other law enforcement agents have independently corroborated through toll records, recorded conversations, video recordings, physical surveillance, and other law enforcement confidential sources. CW-1 agreed to be recorded and to testify, if required. CW-1 has proven to be a credible and reliable informant. I have never found CW-1 to have knowingly provided false information).

[2] The subscriber information for this number is ANTHONY JACK, ("TARGET TELEPHONE 1"), with an address of 36 Brown, Dorchester Center, MA.  In my training and experience, I have found that narcotics and gun traffickers often use cellular telephones which are pre-paid or subscribed to in fictitious names or names of others to thwart detection by law enforcement.

location where he/she turned over the evidence to me or another law enforcement officer working on this investigation. In each case, CW-1 was debriefed. Additionally, a field test was performed on the drugs that had been purchased. In each case the field tests returned a positive indication for the presumptive presence of the drug purchased. The controlled substances acquired by CW-1 were also weighed. The "gross weight" of the drugs reported in this affidavit refers to the weight of the controlled substance and the materials in which they were packaged at the time of purchase. All the controlled substances were sent for laboratory testing. If available, I provide the results with a net weight of the drug actually acquired. Whenever I use the terms "controlled buy" or "controlled purchase" in this affidavit, this was the procedure that we followed.

**February 16, 2022 Controlled Buy**

16.    On February 14, 2022, I and other members of the Task Force met with CW-1 for the purpose of placing a recorded telephone call to NELSON. At approximately 12:25 pm, CW-1 placed a consensually recorded telephone call to NELSON on the 3141 number. This call was placed on speakerphone for agents to listen. Upon ending the call, CW-1 advised he/she spoke with NELSON. During the call, CW-1 informed NELSON he/she had $500 to purchase narcotics. Although the actual drug type was not specified on the call, the implied drug was crystal methamphetamine, based on past conversations between CW-1 and NELSON. CW-1 specified he/she wanted to make the purchase on Wednesday (2/16/2022), to which NELSON agreed. CW-1 agreed to call NELSON back on Wednesday when he/she was prepared to purchase the narcotics.

17.     On February 16, 2022, at approximately 11:00 am, in anticipation of the controlled buy taking place, agents initiated surveillance at 172 Pine Street, Pawtucket, RI and at the TARGET PREMISES. Both of these addresses are known to be associated with NELSON.[3]

18.     At approximately 11:16 am, CW-1 placed a consensually recorded telephone call to NELSON on the 3141 number. This call was placed on speakerphone for agents to listen. Upon ending the call, CW-1 advised he/she spoke with NELSON. During the call, CW-1 informed NELSON he/she had $500 to make the purchase. CW-1 also placed an order for a "ball of soft". CW-1 explained "ball of soft" to mean 3.5 grams of powder cocaine, which CW-1 believes to cost between $150 and $200. I also know "ball" to equal a quantity of 3.5 grams of narcotics, and "soft" to be a code word for powder cocaine. NELSON agreed to meet CW-1 at CW-1's location, known to law enforcement to be in the vicinity of 1908 Broad Street, Cranston, RI.

19.     At approximately 11:28 am, CW-1 received a telephone call from NELSON on the 3141 number. This call was placed on speakerphone for agents to listen. Upon ending the call, CW-1 advised he/she spoke with NELSON. During the call, NELSON asked if CW-1 was "good". CW-1 understood this to mean NELSON was asking if CW-1 had the entire amount of purchase funds to buy the crystal meth and powder cocaine. CW-1 responded in the affirmative.

---

[3] During the investigation, I learned that mail addressed to Anthony Nelson at the TARGET PREMISES is being delivered to the TARGET PREMISES by the United States Postal Service.  The TARGET PREMISES is an apartment within a multifamily structure.  The multifamily structure is located on the corner of Hilton and White streets in Pawtucket RI.  There are three doors to enter the structure on the Hilton Street side of the building (two doors on the first floor of the building which are accessible from the street and front porch and one door facing Hilton Steet leading to a second floor porch).  There is one door on the structure which faces White Street, and one door to the left of the door facing White Street which appears to be the back of the building  and faces a two-car detached garage (the garage door faces White Street).  I learned that the TARGET PREMISES is accessed through the door on the structure facing the two-car detached garage (the door will hereinafter be referred to as the "side/rear door").  In May of 2020, Pawtucket police responded to this address for a domestic incident.  The responding officer encountered Nelson and a female in the TARGET PREMISES which was accessed by this side/rear door facing the two-car detached garage.

20.    At approximately 11:29 am, agents observed the TARGET VEHICLE as it arrived in the vicinity of the TARGET PREMISES. Surveillance units observed the TARGET VEHICLE as it passed the TARGET PREMISES and drove directly to Rosa's Kitchen, located at 757 Main Street, Pawtucket, RI where it arrived at approximately 11:30 am. This location is located one block from the TARGET PREMISES, and is known to CW-1 to be a location where NELSON frequently conducts narcotics transactions. Upon arrival, agents identified NELSON as he exited the driver's seat of the TARGET VEHICLE and entered the front door of Rosa's Kitchen. Surveillance units observed NELSON to be wearing a blue and orange hooded sweatshirt, and observed the TARGET VEHICLE to still be running while NELSON was inside the restaurant.

21.    At approximately 11:32 am, agents observed NELSON as he exited Rosa's Kitchen and got back into the driver's seat of the TARGET VEHICLE. Shortly thereafter, agents followed NELSON as he departed that location.

22.    Pursuant to the procedures outlined above, I searched CW-1's person for money and contraband with negative results. I provided CW-1 with a recorder (equipped with audio/video surveillance equipment) and $650 in Official Agency Funds (OAF.) This amount represented $500 for the crystal meth, and $150 for the 3.5 gram of powder cocaine. I directed CW-1 to proceed to the vicinity of 1908 Broad Street, meet with NELSON and purchase $500 worth of crystal meth and 3.5 grams of powder cocaine. I surveilled CW-1 to the vicinity of 1908 Broad Street, where he/she arrived at approximately 11:51 am.

23.    At approximately 12:05 pm, after being continuously surveilled from 757 Main Street, agents observed NELSON as he arrived and parked the TARGET VEHICLE in the

9

vicinity of 1908 Broad Street. A minute later, I observed CW-1 as he/she entered the passenger side front seat of the TARGET VEHICLE. NELSON remained parked in that location.

24.     At approximately 12:11 pm, the below signed observed CW-1 as he/she exited the front passenger seat of the TARGET VEHICLE and departed the area on foot. Moments later, agents followed NELSON as he departed the area.

25.     I followed CW-1 from 1908 Broad Street to a pre-determined meeting location where he/she arrived at approximately 12:13 pm. CW-1 provided me with the recorder and three clear plastic bags. One of the clear plastic bags contained a hard, opaque, crystal-like substance consistent in color and texture with crystal methamphetamine. The suspected crystal methamphetamine had a total gross weight of approximately 14.8 grams, and field tested positive for the presence of methamphetamine. The other two clear plastic bags each contained a soft, white powdery substance consistent ion color, texture, and odor with that of powder cocaine. The bags of suspected cocaine had a total combined gross weight of approximately 4.0 grams, and field tested positive for the presence of cocaine and fentanyl. I searched CW-1's person for money and contraband with negative results.

26.     CW-1 was debriefed, and informed me that as NELSON arrived in the vicinity of 1908 Broad Street, NELSON called CW-1 from the 3141 number and instructed CW-1 to get into the TARGET VEHICLE. As CW-1 entered the passenger side front seat of the TARGET VEHICLE, CW-1 identified NELSON as the driver and sole occupant of the car. Shortly after entering the car, CW-1 placed $500 of purchase funds on the center console. NELSON retrieved the funds and removed a plastic bag from his right front pocket. This bag contained numerous clear plastic bags containing crystal methamphetamine and cocaine. NELSON supplied CW-1 with one bag of crystal meth, and two smaller bags of powder cocaine, saying specifically,

"there's two half baskets right there." CW-1 and I, the below signed agent, know "basket" to mean "ball", or, 3.5 grams of narcotics. NELSON quoted CW-1 a total price of $650 for the entire purchase. At that time, CW-1 paid NELSON the remaining $150 in OAF. NELSON then inquired if CW-1 was "good", which CW-1 previously believed to mean whether or not CW-1 had the purchase funds for the narcotics order. CW-1 now understood this now for NELSON to ask whether or not CW-1 was in possession of any fentanyl which CW-1 could deliver to NELSON. CW-1 believes NELSON to use fentanyl recreationally. CW-1 informed NELSON that he/she was not in possession of any fentanyl. Upon conclusion of the deal, CW-1 exited NELSON's vehicle, and returned to the predetermined meeting location.

27.     I reviewed the DVD containing the audio/video recording of the controlled purchase, and identified NELSON as the person who supplied CW-1 with the narcotics.

28.     All three bags of suspected narcotics were submitted for laboratory analysis. The results of the lab tests are still pending.

**The February 18, 2022 Controlled Buy**

29.     On February 18, 2022, CW-1 met with members of the Task Force to arrange a controlled buy from NELSON. At approximately 10:00 am, in anticipation of the controlled buy taking place, agents initiated surveillance at the TARGET PREMISES. Upon doing so, agents observed the TARGET VEHICLE parked in the driveway of the TARGET PREMISES next to the side/rear door of the residence.

30.     At approximately 11:00 am, CW-1 placed a consensually recorded telephone call to NELSON on the 3141 number. This call was placed on speakerphone for agents to listen. Upon ending the call, CW-1 advised he/she spoke with NELSON. During the call, CW-1 placed an order for "the same shit", meaning, the same quantity of narcotics CW-1 purchased from

NELSON on February 16, 2022. I know this amount to 14 grams of crystal methamphetamine, and 3.5 grams of powder cocaine. NELSON stated he would call CW-1 when he was prepared to conduct the transaction.

31.     At approximately 11:20 am, at the direction of agents, CW-1 placed another outgoing call to NELSON on the 3141 number. This call was placed on speakerphone for agents to listen. During the call, CW-1 told NELSON that he/she had access to a vehicle and would be able to meet NELSON. NELSON told CW-1 to come now to "the bucket." CW-1 and I know "the bucket" to refer to the city of Pawtucket, RI. Specifically, CW-1 believed NELSON instructed CW-1 to meet at Rosa's Kitchen, located at 757 Main Street, Pawtucket, RI.

32.     At approximately 11:22 am, agents observed NELSON exit the side/rear door of the TARGET PREMISES wearing a blue and white hat, camouflage jacket, pin shorts and flip flops. NELSON then walked to and entered a white Hyundai sedan, bearing Massachusetts registration 4BAF71 on Hilton Street at the intersection of White Street.

33.     At approximately 11:34 am, agents observed NELSON as he exited the white Hyundai holding a white paper bag and return to the driveway area of the TARGET PREMISES.

34.     Pursuant to the procedures outlined above, agents searched CW-1's person for money and contraband with negative results, and provided CW-1 with a recorder (equipped with audio/video surveillance equipment) and $650 in OGC. This amount represented $500 for the crystal meth, and $150 for the 3.5 gram of powder cocaine. Agents directed CW-1 to proceed to the vicinity of 757 Main Street, Pawtucket, RI, meet with NELSON and purchase $500 worth of crystal meth and 3.5 grams of powder cocaine. Agents surveilled CW-1 to that location, where he/she arrived at approximately 11:50 am.

35.     At approximately 11:46 am, prior to CW-1's arrival at 757 main Street, agents observed NELSON as he walked from the side/rear area of the TARGET PREMISES and entered the TARGET VEHICLE. Within moments, surveillance units followed NELSON from the TARGET PREMISES to 757 Main Street, where he arrived at approximately 11:48 am. Upon arrival, NELSON remained seated in the TARGET VEHICLE.

36.     As CW-1 arrived in front of 757 Main Street, agents observed CW-1 as he/she entered the front passenger seat of the TARGET VEHICLE.

37.     At approximately 11:55 am, agents observed CW-1 as he/she exited the TARGET VEHICLE. Upon doing so, CW-1 notified agents that he/she had purchased the cocaine from NELSON, but that NELSON had to leave to obtain the crystal methamphetamine. NELSON instructed CW-1 to wait at the restaurant until he returned with the crystal meth.

38.     Immediately thereafter, surveillance units observed NELSON depart 757 main Street in the TARGET VEHICLE, and surveilled him back to the TARGET PREMISES where arrived at approximately 11:57 am. Specifically, agents observed NELSON as he parked on Hilton Street, which is located adjacent to the TARGET PREMISES. Agents observed NELSON as he exited the TARGET VEHICLE and walked along the rear fence line towards the side/rear door of the TARGET PREMISES. Due to an obstruction in view, agents did not observe NELSON physically enter the residence. However, the path which NELSON took along the fence line leads directly to the side/rear door of the TARGET PREMISES.

39.     At approximately 12:13 pm, agents observed NELSON as he walked from the side/rear area of the TARGET PREMISES and walk along the rear fence line of the residence. NELSON was observed as he got back into the driver's seat of the TARGET VEHICLE. Agents surveilled NELSON from the TARGET PREMISES to the vicinity of 757 Main Street, where he

arrived at approximately 12:15 pm. Upon arrival, agents observed CW-1 as he briefly reached

into the rear seat area of the TARGET VEHICLE. Within moments, agents observed NELSON

as he departed the area.

40.     Agents followed CW-1 from the vicinity of 757 Main Street to a pre-determined

meeting location where he/she arrived at approximately 12:19 pm. CW-1 provided agents with

the recorder and two clear plastic bags. One of the clear plastic bags contained a hard, opaque,

crystal-like substance consistent in color and texture with crystal methamphetamine. The

suspected crystal methamphetamine had a total gross weight of approximately 14.4 grams, and

field tested positive for the presence of methamphetamine. The other two clear plastic bags each

contained a soft, white powdery substance consistent ion color, texture, and odor with that of

powder cocaine. The bags of suspected cocaine had a total combined gross weight of

approximately 3.8 grams, and field tested positive for the presence of cocaine and fentanyl. I

searched CW-1's person for money and contraband with negative results.

41.     CW-1 was debriefed, and informed agents that shortly after arriving in the

vicinity of 757 Main Street, CW-1 called NELSON on the 3141 number, where NELSON

instructed CW-1 to walk to and get into the TARGET VEHICLE. As CW-1 entered the

passenger side front seat of NELSON's vehicle, NELSON said he confused CW-1 for another

one of his customers, and accidently brought with him four "balls" of powder, not the four

"balls" of crystal meth. At NELSON's direction, CW-1 paid NELSON the $200 for one "ball" of

cocaine. In exchange, NELSON supplied CW-1 with the 3.5 grams of cocaine. NELSON stated

he had to leave to pick up the crystal meth, and instructed CW-1 to wait at that location for

NELSON to return. Shortly thereafter, CW-1 observed NELSON as he arrived back at that

location driving the TARGET VEHICLE. CW-1 observed a female in the front passenger seat of

14

the TARGET VEHICLE. CW-1 walked up the TARGET VEHICLE, opened the rear passenger side door, and paid NELSON the $450 of OGC. In exchange, NELSON supplied CW-1 with the crystal meth. Upon conclusion of the deal, CW-1 returned to the predetermined meeting location.

42.     I reviewed the DVD containing the audio/video recording of the controlled purchase, and identified NELSON as the person who supplied CW-1 with the narcotics.

43.     All three bags of suspected narcotics were submitted for laboratory analysis. The results of the lab tests are still pending.

44.     Based on the information CW-1 provided regarding NELSON telling CW-1 that he had to leave CW-1 to pick up the crystal meth, and law enforcement observations of NELSON going directly to the TARGET PREMISES before returning to provide crystal meth to CW-1, I believe NELSON is storing narcotics at the TARGET PREMISES.

**February 23, 2022 Controlled Buy**

45.     On February 23, 2022, CW-1 met with members of the Task Force to participate in a controlled buy from NELSON. At approximately 10:30 am, in anticipation of the controlled buy taking place, agents initiated surveillance at the TARGET PREMISES. Upon doing so, agents observed the TARGET VEHICLE parked next to the side/rear door of the TARGET PREMISES.

46.     At approximately 10:45 am, CW-1 placed a consensually recorded telephone call to NELSON on the 3141 number. This call was placed on speakerphone for agents to listen. Upon ending the call, CW-1 advised he/she spoke with NELSON. During the call, NELSON instructed CW-1 to meet NELSON "up this way", referring to Pawtucket, RI. Specifically, NELSON, said, "call me when you're here near Rosa's." I know "Rosa's" to mean Rosa's Kitchen, located at 757 Main Street, Pawtucket, RI. Although CW-1 did not place an order for a

15

specific amount of narcotics, CW-1 believed he/she could purchase seven grams of crystal methamphetamine and 3.5 grams of powder cocaine. Based on previous controlled purchases of narcotics from NELSON, CW-1 believed seven grams of crystal meth to cost $240, and 3.5 grams of powder cocaine to cost $200.

47.     Pursuant to the procedures outlined above, I searched CW-1's person for money and contraband with negative results. I provided CW-1 with a recorder (equipped with audio/video surveillance equipment) and $440 in OGC. I directed CW-1 to proceed to the vicinity of 757 Main Street, meet with NELSON and purchase seven grams of crystal meth and 3.5 grams of powder cocaine. I surveilled CW-1 as he/she began travelling to 757 Main Street.

48.     At approximately 10:53 am, agents identified NELSON as he exited the side/rear door of the TARGET PREMISES, and walked to 757 Main Street. As NELSON arrived at that location, I observed CW-1 as he/she also arrived. As CW-1 arrived, surveillance units observed CW-1 as he loitered in the area.

49.     At approximately 10:58 am, CW-1 placed a consensually recorded telephone call to NELSON on the 3141 number. This call was captured via the audio/video recording device on CW-1's person. Upon ending the call, CW-1 notified agents of the conversation. During the call, NELSON inquired if CW-1 wanted to purchase "the same thing", referring to the same amount of narcotics which CW-1 purchased during the last controlled buy on February 18, 2022. CW-1 responded, saying, "two and one", meaning, two "balls" (seven grams) of crystal meth, and one "ball" (3.5 grams) of powder cocaine. NELSON agreed, and stated he would meet CW-1 momentarily.

50.     Simultaneously, surveillance units observed NELSON as he began walking back to the TARGET PREMISES, where he arrived at approximately 11:00 am. Upon arrival, agents

16

observed NELSON as he entered the same side/rear door of the TARGET PREMISES which he

exited earlier that morning.

51.     At approximately 11:08 am, agents observed NELSON as he exited the side/rear

door of the TARGET PREMISES and departed the area on foot. NELSON was observed as he

walked back to the vicinity of 757 Main Street where he met CW-1. NELSON and CW-1 entered

CW-1's vehicle, and surveillance units followed them as they departed the vicinity of 757 Main

Street. Agents followed CW-1 and NELSON to the vicinity of 107 Mineral Spring Avenue,

Pawtucket, RI, where they arrived at approximately 11:13 am. Due to an obstruction in view,

agents did not observe which apartment NELSON entered.

52.     At approximately 11:20 am, agents observed CW-1 and NELSON as they

departed the vicinity of 107 Mineral Spring Avenue to the vicinity of 757 Main Street, where

they arrived at approximately 11:23 am. Moments later, agents observed NELSON walking

away from that area on foot.

53.     I followed CW-1 from the vicinity of 757 Main Street to a pre-determined

meeting location where he/she arrived at approximately 11:31 am. CW-1 provided me with the

recorder and three clear plastic bags. One of the clear plastic bags contained a hard, opaque,

crystal-like substance consistent in color and texture with crystal methamphetamine. The

suspected crystal methamphetamine had a total gross weight of approximately 8.0 grams, and

field tested positive for the presence of methamphetamine. The other two clear plastic bags each

contained a soft, white powdery substance consistent ion color, texture, and odor with that of

powder cocaine. The bags of suspected cocaine had a total combined gross weight of

approximately 3.7 grams, and field tested positive for the presence of cocaine and fentanyl. I

searched CW-1's person for money and contraband with negative results.

17

54.     CW-1 was debriefed, and informed me that as NELSON arrived in the vicinity of 757 Main Street, NELSON informed CW-1 that they needed to drive to a location to obtain the crystal meth. CW-1 complied, and followed the driving directions provided by NELSON. After a short ride, CW-1 arrived at an unknown multi-family residence. NELSON exited CW-1 vehicle and waled into an apartment. Minutes later, NELSON exited the apartment and got back into CW-1's vehicle. Upon doing so, NELSON supplied CW-1 with the crystal methamphetamine and cocaine. In exchange, CW-1 paid NELSON the $440 of OGC. CW-1 drove NELSON back to the vicinity of 757 Main Street, where NELSON exited the vehicle and departed the area on foot. Upon conclusion of the deal, CW-1 returned to the pore-determined meeting location.

55.     I reviewed the DVD containing the audio/video recording of the controlled purchase. Although the actual pass of money for drugs was not observed, I identified NELSON as the person who met with CW-1. I also overheard NELSON and CW-1 exchange conversation consistent with that of drug trafficking. Specifically, I heard CW-1 say to NELSON, "what do I owe you, I have 440", to which NELSON confirmed. I also overheard to counting of money.

56.     All three bags of suspected narcotics were submitted for laboratory analysis. The results of the lab tests are still pending.

***GPS Ping on the 3141 Number***

57.     On February 17, 2022, the Honorable Magistrate Judge Patricia A. Sullivan, District of Rhode Island, authorized a search warrant for GPS "ping" location information for the 3141 number. See 22-SW-043-PAS. The GPS pings began collecting on February 18, 2022. On each day since February 18, the 3141 number has pinged in the vicinity of the TARGET PREMISES numerous times throughout each day. Of note, the 3141 number has pinged in the vicinity of the TARGET PREMISES for multiple-hour spans during the early morning hours of

each day, indicating NELSON has been utilizing the TARGET PREMISES as his primary bed-down location.

58.     Furthermore, throughout the course of this investigation, I conducted records checks with the Rhode Island Division of Motor Vehicles, which revealed NELSON has an active drivers license with a listed address of 36 White Street, Pawtucket, RI. I also conducted records checks with the Rhode Island Department of Corrections, which revealed NELSON's address as 36 White Street, Pawtucket, RI as recent as September 16, 2021.

59.     Based on this investigation to date, agents identified MARIA GOMES as NELSON's girlfriend. Specifically, on or about January 23, 2022, GOMES accompanied NELSON to Sturdy Memorial Hospital in Attleboro, Massachusetts. NELSON was admitted to the emergency room that evening for a gunshot wound to his hand. Detectives from Attleboro Police Department were notified of the incident, and arrived at the hospital to interview NELSON. NELSON ultimately refused to cooperate with police, and detectives seized his cellular telephone pending the application of a search warrant. Detectives then interview GOMES, who was waiting in the waiting room. GOMES identified herself as NELSON's girlfriend. A search warrant for NELSON's phone was obtained in Massachusetts, and a copy of that phone extraction was provided to me on February 24, 2022. Upon review of the phone data, I identified a phone number in NELSON's phone stored as "Wifey". I know the term "wifey" to be a common term referring to someone's significant other. The phone number associated with this contact is (401) 617-4327 (the 4327 number). I conducted records checks with respect to this number, which revealed the 4327 number to be associated with NELSON at 36 White Street, apartment 1, Pawtucket, RI. Additional records checks revealed the 4327 number to also be associated with GOMES. I then conducted records checks with the Rhode Island DMV, which

revealed GOMES has an active license with a listed address of 36 White Street, apartment 1, Pawtucket, RI.[4]

60.     I also searched through text messages on NELSON's phone extraction, which revealed numerous text messages exchanged between GOMES and NELSON. Based on the content of these texts messages, I believe NELSON and GOMES to be engaged in a romantic relationship, which further suggests NELSON to be using the TARGET PREMISES as his primary residence.

### Conclusion

61.     Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that NELSON has committed the crimes set forth in the accompanying criminal complaint.

62.     I further submit that there is probable cause to believe that the premises located at 63 White Street, apartment 1, Providence, RI (the "TARGET PREMISES") which is more specifically described in Attachment A-1 presently contains the items set forth in Attachment B-1, and NELSON's vehicle, a black 2010 BMW 535i sedan, bearing Rhode Island registration 1FZ181 (the "TARGET VEHICLE") which is more specifically described in Attachment A-2, presently contains the items set forth in Attachment B-2, and that those items described in Attachments B-1 and B-2 constitute evidence of the commission of a criminal offense, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, violations of 21 U.S.C. §§ 841(a)(1).

---

[4] GOMES is also receiving mail addressed to her at the TARGET PREMISES.

63.        Accordingly, I respectfully request that an arrest warrant be issued for NELSON, and search warrants be issued for the seizure of these items described in Attachments B-1 and B-2 from the TARGET PREMISES and the TARGET VEHICLE. I, Caolan Scott, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information and belief.

Respectfully submitted,

Caolan R. Scott
Special Agent

Federal Bureau of Investigation

| Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ telephone _____ . |
|---|
| (*specify reliable electronic means*) |
| _____                   _____ |
| *Date*                                        *Judge's signature* |
| _____                   Lincoln D. Almond, U.S. Magistrate Judge |
| *City and State*                            *Printed name and title* |

21